NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
    1100 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0102
    Facsimile: (213) 894-6269
    E-mail:   andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JEFFREY CRAIG YOHAI,<br><br>        Defendant. | Nos. CR 18-11-AB,<br>     CR 19-271-AB<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S SENTENCING POSITION; DECLARATION OF SA EBADI<br><br>Hearing: November 8, 2019<br>          1:30 |

## I.    THE SENTENCING GUIDELINES

**A.    THE STANDARD OF PROOF IS A PREPONDERANCE OF THE EVIDENCE, <u>NOT</u> CLEAR AND CONVINCING AS DEFENDANT CLAIMS**

Defendant argues in his sentencing position (Defendant's Position Re: Sentencing, filed under seal on September 30, 2019 "Deft's Brief") that the government must prove the loss enhancement by clear and convincing evidence, relying on <u>United States v. Jordan</u>, 256 F.3d 922 (9th Cir. 2001) and its progeny.  (Deft's Brief 3-4.)  While the government maintains that the Ninth Circuit authority which sometimes requires clear and convincing proof of sentencing factors with an extremely disproportionate effect on a

defendant's sentence are wrongly decided,[1] even under these cases it is clear that the appropriate standard of proof for defendant's enhancements is a preponderance of the evidence.

Under Jordan, 256 F.3d at 928, there are six factors that courts should consider in determining the appropriate standard of proof for sentencing factors.  Defendant does not analyze these six factors.  But a single factor is dispositive in this case:  whether the count of conviction was for conspiracy, in which case the preponderance standard applies.  This is because:

> Enhancements based on the extent of a conspiracy are on a
> fundamentally different plane than enhancements based on
> uncharged or acquitted conduct.  Due process concerns with
> regard to the former are satisfied by a preponderance of the
> evidence standard because the enhancements are based on
> criminal activity for which the defendant has already been
> convicted.

United States v. Armstead, 552 F.3d 769, 777 (9th Cir. 2008) (citations and quotations omitted).  Because defendant pled guilty to conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349, the clear and convincing standard cannot apply even if all the other factors favor that standard.  (Discussed more fully as factor four below.)

---

[1] The government preserves its position that United States v. Hopper, 177 F.3d 824 (9th Cir. 1999), and its progeny, including United States v. Jordan, 256 F.3d 922 (9th Cir. 2001), are wrongly decided.  In particular, the government maintains that a preponderance of the evidence standard should apply to all sentencing enhancements and other calculations under the Guidelines. See USSG § 6A1.3, commentary (the "Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements").

## The Six *Jordan* Factors

For the sake of completeness, the government will address all six Jordan factors, even though factor four is dispositive by itself.

One: whether "the enhanced sentence fall[s] within the statutory maximum for the crime alleged in the indictment." Jordan, 256 F.3d at 928 (citations and quotations omitted).  Here, the crimes to which defendant pled guilty in two separate cases, Conspiracy to Commit Wire Fraud, one with a statutory maximum enhanced because he committed the offense while on bond, carry a combined maximum sentence of 50 years' (600 months') incarceration, 18 U.S.C. § 1349, 1343, 3147, while defendant's guideline range, while contested, is likely well below that; the Probation Office, for example, found it to be 210 to 262 months, less than half the statutory maximum.

Two: whether "the enhanced sentence negate[s] the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment."  Id.  Here, the loss enhancement did not negate the presumption of innocence or change the prosecution's burden of proof: the government was still required to prove beyond a reasonable doubt each of the elements of the crimes alleged in the informations.  See United States v. Restrepo, 946 F.2d 654, 657 (9th Cir. 1991), cert. denied, 503 U.S. 961 (1992) (the Guidelines in general and the relevant conduct section in particular do not negate the presumption of innocence or the prosecutor's burden of proving guilt with regard to the underlying crime).

Three: whether "the facts offered in support of the enhancement create a new offense requiring separate punishment." Jordan, 256

F.3d at 928.   Here, the sentencing enhancement is for the loss associated with defendant's conspiracies; it did not punish defendant for any new offense.   Cf. Mezas de Jesus, 217 F.3d 638 (clear and convincing proof required when, among other factors, defendant who had pled guilty merely to being an alien in possession of a firearm was sentenced based on an uncharged kidnaping).

**The Lone Dispositive Factor for Conspiracy Convictions**

Four: whether "the increase in sentence [is] based on the extent of a conspiracy."   Jordan at 928.   The breadth of a conspiracy charge opens a defendant to a similarly broad range of sentencing enhancements.   See United States v. Harrison-Philpot, 978 F.2d 1520, 1523 (9th Cir. 1992) (sentencing factor which increased sentencing range from 41-51 months to 292-365 months may be proved by preponderance of evidence because defendant "was charged and convicted of conspiracy [and it was] the extent of the conspiracy [that] caused the tremendous increase in [defendant's] sentence.").

The Ninth Circuit has "repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence." United States v. Treadwell, 593 F.3d 990, 1001 (9th Cir. 2010) (emphasis added) (affirming the district court's use of the preponderance standard at sentencing when applying a 22-level enhancement for losses exceeding $44 million in a conspiracy to commit wire fraud case).   Accord, United States v. Berger, 587 F.3d 1038, 1048 (9th Cir. 2009) ("our cases . . . . involv[ing] a defendant's fraudulent conduct where sentencing enhancements for financial loss are based on the extent of the fraud conspiracy. . . . hold that facts underlying the disputed enhancements need only be found by a preponderance of the

evidence."). Here, this factor by itself establishes that the preponderance standard applies because defendant's convictions in both cases are for conspiracy to commit wire fraud, and it is the extent of this conspiracy, in particular the losses it caused, that justifies defendant's enhancements.

Five: whether "the increase in the number of offense levels [is] less than or equal to four." Jordan at 928. Defendant contends that both loss and restitution are $4,769,321.89 (Deft's Brief at 8), which corresponds to a loss enhancement of +18 levels. USSG § 2B1.1(b)(1)(J). The government, in contrast, calculates the total loss for the conspiracy at well above the $9.5 million guideline threshold, or +20 levels. This two-level difference favors the application of the preponderance standard.

Six: whether "the length of the enhanced sentence more than double[s] the length of the sentence authorized by the initial sentencing Guideline range in a case where the defendant would otherwise have received a relatively short sentence." Jordan at 928. This factor also favors the preponderance standard, in two different ways. First, the disputed loss enhancement does not "more than double the length of the sentence." And second, defendant would not "otherwise have received a relatively short sentence." Even with the +18-level loss enhancement defendant claims applies, his guideline range would be 168-210 months, according to Probation, which is no one's idea of a "relatively short sentence."

All of the Jordan factors point to the application of the preponderance standard in this case. Even if the majority of the factors did point the other way, it would not matter because the one critical factor – that defendant was convicted of conspiracy and the

loss enhancement is based on the extent of that conspiracy – calls for the application of the preponderance standard.  Accordingly, the Court should apply the preponderance standard.  <u>United States v. Armstead</u>, 552 F.3d 769, 777 (9th Cir. 2008) ("the district court did not err by finding the number of victims by a preponderance of the evidence because <u>sentencing enhancements based entirely on the extent of the conspiracy do not require the heightened standard of proof</u>") (emphasis added).

**B.   THE COURT SHOULD CONSIDER DEFENDANT'S MUSICAL FESTIVAL TICKET FRAUD**

Defendant asserts that he should not be held to account for his offering for sale VIP tickets to the Coachella Music Festival that he did not possess, and then playing his classic run-around game with his victims where he first promised refunds that never occurred, then gave them worthless checks, and finally offered fabricated "proof" of having refunded their money electronically when they tired of his empty promises.  (Deft's Brief at 5; PSR ¶¶ 32-33.)

Instead, defendant contends that the Court can only consider the specific misconduct to which he admitted in the plea agreement. This is incorrect.  The parties had no agreement as to restitution or the loss enhancement.  (CR 19-271-AB Plea Agreement ¶¶ 9, 12.) They agreed only that defendant was part of a "wire fraud" conspiracy beginning "in August, 2017, and continuing through at least October 30, 2018."  (CR 19-271-AB Plea Agreement ¶ 10.)  To be sure, the plea agreement specifically mentioned defendant's fraud involving luxury home rentals, but that was listed merely as in "furtherance of the conspiracy," not as a complete description of

the conspiracy.  (Id.)  Indeed, the guidelines themselves make clear that for offenses like fraud, the court should consider as relevant conduct everything that was part of the same course of conduct or common scheme:

> [W]ith respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

USSG § 1B1.3(a)(2).  Here, defendant's modus operandi never changed. Whether seeking money from investors, would-be ticket purchasers, or would-be home renters, he always lied to obtain as much money as he could for a specific purpose, instead used that money for any purpose, and then gave the victim the run-around to "buy time," in defendant's own words, by promising refunds, issuing worthless checks, feigning shock that refunds had not gone through, and then fabricating "proof" of refunds, commonly by emails that purported to document wire transfers, so while defendant's "sale" of non-existent tickets was not specified in his plea agreement, it is clearly part of the defendant's "same course of conduct or common scheme."

In any event, the losses associated with non-existent tickets is only $80,800 (Ebadi Decl. page 20), and so is not large enough to result in a different guideline loss enhancement.

Finally, assuming for the sake of argument that the Court were to ignore defendant's fraud over the VIP tickets for loss purposes, the Court should then consider them in defendant's criminal history category.  Cf. USSG § 4A1.3(2)(E) (in determining whether an upward departure in criminal history category is appropriate, the court may consider "Prior similar adult criminal conduct not resulting in a criminal conviction.")

## C.   THE GUY AROCH LOSSES ARE ACCURATE

There is no dispute that victim Guy Aroch lost $2.9 million from investing in fraudulent real estate deals with defendant. (PSR ¶¶ 18, 19, 46, 47.) But defendant argues that because $1.8 million of that went to others, he should only be held to account for $1.1 million. (Deft's Brief 5-6.) Defendant is mistaken. The mere fact that defendant provided to others $1.8 million of Guy Aroch's money in no way absolves him of having cheated Mr. Aroch out of that money in the first place.

## D.   GENESIS CAPITAL HAS NOW ELIMINATED ITS LOSSES UNDER THE GUIDELINES, AS DEFENDANT CLAIMS

Defendant correctly argues that under the guidelines, Genesis Capital now has no recognizable lose, as it was able to sell the property pledged as collateral for more than the initial loan value. (Deft's Brief 6-7.)

## E.   THE RS LENDING LOSSES SHOULD BE REDUCED BY $100,000, AS DEFENDANT ARGUES

Defendant is correct that RS Lending withheld $100,000 of a loan to cover the first year's interest. (Deft's Brief 7.) Accordingly, the government agrees that RS Lending's actual loss should be $1,784,000 under the sentencing guidelines. (PSR ¶¶ 23-24.)

## F.   THE LOSS TO AMERICAN EXPRESS FOR TZVI GROSSMAN'S RENTAL SHOULD BE REDUCED BY $10,000, AS DEFENDANT ARGUES

Defendant is correct that the loss to American Express for Tzvi Grossman's rental is $10,000, not $20,000. (Deft's Brief 7; PSR ¶ 35.)

## G.   THE COURT SHOULD CONSIDER DEFENDANT'S DEFRAUDING THE HOFFMANS OUT OF $3 MILLION

In its initial sentencing position, the government submitted the case agent's declaration which included five pages detailing defendant's fraud against the Hoffmans, and which it is undisputed cost them $3 million.  Defendant does not dispute any of the facts set forth in that declaration, but nonetheless argues that the Court should ignore them because (1) almost all of the money obtained from the Hoffmans was used for the specified purpose, and (2) defendant claims that the standard of proof for loss is clear and convincing evidence.  (Deft's Brief at 11.)  As set forth in Section I.A. above, however, the standard of proof is actually a preponderance of the evidence.

More to the point, defendant's argument about the Hoffmans' money largely being applied to its intended purpose, while true, is a misdirection.  Defendant does not dispute that he lied to the Hoffmans in the following ways:  (1) regarding how much money defendant had and whether he needed the Hoffmans' investment to purchase 1550 Blue Jay Way, (2) claiming that the property was "extremely inexpensive" and "under-priced" even though defendant agreed to pay $1 million over its appraised value, (3) keeping $210,000 of the Hoffmans' money for personal and unrelated expenses, (4) tricking the Hoffmans out of releasing their deed of trust on the property by falsely promising that new financing would be deposited into an account they also controlled, but then depleting that account without giving the Hoffmans access to it, (5) sending fabricated bank documents to the Hoffmans to "support" defendant's lies because, as defendant admitted, he did not want them to "go

ballistic," (6) falsely telling the Hoffmans he obtained permits when he had not, (7) providing the Hoffmans with an altered email from creditor Genesis that said its loan on the property had been paid when in fact the loan was in default and the original email said the loan had not been paid, and (8) providing the Hoffmans with a fabricated $7.5 million purchase agreement for a different property in order to lull them into thinking that defendant would soon be flush with funds.  (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, pages 13-18.)  Indeed, defendant's frivolous disputation of this relevant conduct demonstrates further that he has failed to accept responsibility for his offense, discussed in more detail below.

**H.  THE COURT SHOULD CONSIDER DEFENDANT'S DEFRAUDING BANKS OUT OF $108,000, AND LEAVING MATTHEW BEHAR WITH THE BILL**

Defendant again attempts to mislead the Court with half-truths when he argues that he is not responsible for the losses he generated for banks when he falsely applied for credit cards using his cousin Matthew Behar's identity.  Defendant acts as though the issue was whether or not Mr. Behar knew of the fraud, arguing that he received the bills and forwarded them to defendant, so Mr. Behar was not deceived.  (Deft's Brief 11-12.)  It is true that Mr. Behar knew defendant was using his identity to make credit card charges, as the government set forth in its initial sentencing position (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, page 18), but irrelevant. The main victims are the banks that issued the credit cards, which defendant duped into doing so based on the good credit of Mr. Behar, rather than defendant's true history of nonpayment and fraud. Indeed, it is banks that have sustained the loss, as Mr. Behar has not paid the balances.  Not that it matters for purposes of loss,

but Mr. Behar was *also* a victim of defendant's fraud, and now has ruined credit to show for his trust of defendant.  While Mr. Behar knew that defendant was using his identity to obtain credit cards, he only agreed to permit that because defendant also duped him, falsely telling Mr. Behar that he had a deal with the government so that he would not go to jail (and would therefore be around to pay the balance on the cards), and was doing well financially.  (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, page 18.)  And, as is defendant's specialty, he lulled Mr. Behar into not cancelling the cards despite his failure to pay the balances as agreed by offering false "proof" of payments, in this instance by orchestrating three-way calls with Mr. Behar and the credit card companies in which defendant verbally "paid" the balances with a bank account which, of course, was later reversed due to insufficient funds.  Despite defendant's claim to the contrary, this fraud is very much like his others, especially his use of his wife's name to lease vehicles and his use of Walter Kim's name to obtain an American Express card onto which he then ran up charges, both discussed in more detail below, and his lulling of Matthew Behar with bogus "proof" of payments is defendant's signature fraud technique which he applied to most of his victims.

## I.   THE COURT SHOULD CONSIDER DEFENDANT'S DEFRAUDING DIANA LAZZARINI OUT OF $86,492

Defendant does not deny that he defrauded Diana Lazzarini through an unpaid luxury home rental.  Instead, he claims that the $86,492 loss "is inconsistent with the demand letter for $36,492 that Ms. Lazzarini sent." (Deft's Brief at 12.)  In fact, when Ms. Lazzarini prepared the demand letter, she genuinely believed that

defendant's fabricated evidence of a wire transfer to her had gone through; only after the case agent described to her how defendant regularly fabricated evidence of wire transfers did Mr. Lazzarini comb through her bank records and realize that the purportedly partial payment by wire transfer was entirely fictitious.  (Ebadi Decl. page 20.)

**J.   DR. COPPELSON'S $254,899 IN LOSSES ARE ACCURATE**

In its sentencing objections, the government offered evidence that defendant had defrauded Dr. Coppelson out of $248,000 in rental fees, and cost him at least another $6,899 in legal fees, for a minimum loss of $254,899.  Defendant does not refute these calculations, but rather brushes them aside because in one particular lawsuit against both defendant <u>and</u> Manuela Villa, the real estate agent for a single renter, Karl Anthony Towns, Dr. Coppelson sued for only $109,000.  (Deft's Brief at 12.)  Because Maneula Villa was only involved with one renter, of course, it would have been improper to sue her for losses caused by defendant's fraud involving other renters.  (Ebadi Decl. page 20.)

**K.   THE SECTION 2B1.1(B)(11) ENHANCEMENT APPLIES**

Defendant argues that he should not be held responsible under Section 2B1.1(b)(11)(C)(i) for the "unauthorized . . . use of any means of identification unlawfully to produce or obtain any other means of identification."  Although defendant does not dispute that he applied for an American Express Business Platinum card using the means of identification of Walter Kim, he argues that Mr. Kim's imperfect memory ("he was not sure if he even knew Yohai had opened this card in Kim's name") left open the possibility that Mr. Kim *had*

authorized defendant to do so, which would defeat the "unauthorized" requirement for this enhancement.  (Deft's Brief 8.)

While the Probation Office was correct to conclude that it is more likely true than not that defendant applied for the card without Walter Kim's permission, the Court need not make any finding regarding Walter Kim's lack of consent because this same enhancement is also supported by many other instances in which defendant applied for credit using another person's identity in which it is clear that defendant did so without authorization.  For example, defendant obtained loans in his wife's name by leasing vehicles using her identity without her consent.  Cf. USSG § 2B1.1, app. note 10(C)(ii)(I) (obtaining a bank loan in another person's name supports this enhancement).  In a recorded call from jail on December 17, 2018, defendant asserted to his wife Jessica Manafort that the identity theft charges related to her in the complaint are "made up."  She responded, "I didn't know if they were talking about when you signed my name on all those [Range Rover] leases without me knowing."  Similarly, defendant used the name of his cousin Matthew Behar without authorization to obtain Airbnb and Paypal accounts.  (Ebadi Decl. 21.)

## L.   THE VULNERABLE VICTIM ENHANCEMENT APPLIES

Defendant sets up a straw-man argument regarding the vulnerable victim enhancement.  (PSR ¶¶ 56-57.)  Defendant argues that Guy Aroch is not vulnerable due to mental condition, age, or lack of education, heedless of the fact that neither the government nor the Probation Office ever suggested otherwise.  (Deft's Brief 8-10.)  But a "vulnerable victim" is not just "a person . . . who is unusually vulnerable due to age, physical or mental condition," but

also one "who is otherwise particularly susceptible to the criminal conduct," the prong that defendant ignores.  U.S.S.G. § 3A1.1(b)(1), app. note 2.

The Ninth Circuit "has held that victims of a 'reloading' scheme—that is, victims who are sought out after having already fallen for a fraudulent scheme—'are vulnerable for purposes of enhancing a convicted person's sentence.'"  United States v. Ciccone, 219 F.3d 1078, 1086 (9th Cir. 2000) (citing United States v. Randall, 162 F.3d 557, 560 (9th Cir. 1998)).  Victims who have fallen for one scheme have demonstrated to defendant that they are "particularly susceptible to [defendant's] criminal conduct." U.S.S.G. § 3A1.1(b)(1), app. note 2.  Indeed, defendant's modus operandi for fraud, in which he continuously lulled victims into believing their ventures were proceeding properly and blamed bouncing checks and non-existent wire transfers on "bank errors," was designed to keep his victims both from alerting the authorities to his fraud and to keep them vulnerable to new frauds, which he cynically exploited.  Thus after taking Guy Aroch for $2 million, the bulk of his family's savings, defendant defrauded him again out of another $900,000, amplifying the damage to the Aroch family's finances, under the guise that the new "investment" would get them back the initial $2 million "investment."  (PSR ¶ ¶ 56-57.)  While defendant's exploitation of Guy Aroch's vulnerability—which defendant himself had caused through his earlier fraud which left Mr. Aroch desperate to recoup his first $2 million—is egregious, it is not unique.  Defendant regularly tried to defraud those who had already proven themselves vulnerable to him.  (E.g. CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, pages 19-25) (describing defendant's

repeated defrauding of Dr. Coppelson.)  Accordingly, the vulnerable victim enhancement applies.  <u>United States v. Lloyd</u>, 807 F.3d 1128, 1172-73 (9th Cir. 2015) ("we have twice held, that when, as here, a defendant 'reloads' victims by soliciting more money from those who have already proven susceptible to an investment fraud, including in the telemarketing context, the vulnerable-victim enhancement is appropriate.")

**M.   DEFENDANT WAS A LEADER/ORGANIZER OF MORE THAN FOUR OTHER PARTICIPANTS**

Please see the GOVERNMENT'S SEALED OPPOSITION TO DEFENDANT'S SENTENCING POSITION, filed on October 18, 2019.

**N.   DEFENDANT'S DISPUTATION OF HIS RELEVANT CONDUCT IS MORE EVIDENCE THAT HE HAS FAILED TO ACCEPT RESPONSIBILITY**

In its objections to the PSR, the government questioned whether defendant had genuinely accepted responsibility inasmuch as he committed precisely the same offense in CR 19-271-AB while he was on bond in CR 18-11-AB after pleading guilty in CR 18-11-AB.  (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, pages 10-11).  Defendant has now removed all doubt about that issue by falsely denying relevant conduct.  USSG 3E1.1, app. n. 1(A) (A "defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility.")  Here, defendant has falsely denied being a leader/organizer, falsely denied responsibility for defrauding the Hoffmans, and frivolously contested the bulk of the fraud losses he caused for the Arochs.  It is the defendant's burden to establish

that he has "clearly" accepted responsibility for his offense. United States v. Alexander, 48 F.3d 1477, 1493 (9th Cir. 1995); USSG § 3E1.1(a).  Given that defendant committed a new offense after having pleaded guilty in the first case, and has repeatedly falsely denied relevant conduct, he has failed to carry this burden.

**O.   DEFENDANT'S GUIDELINE SUMMARY**

Defendant's <u>undisputed</u> guideline factors are as follows:

Base Offense Level:          7  (PSR ¶¶ 8, 54(a))

More than 10 victims:        +2  (PSR ¶ 54(c))

Sophisticated means:         +2  (PSR ¶ 54(d))

Over $1 million gross:       +2  (PSR ¶ 54(f))

Commission of offense on bond: +3  (PSR ¶ 8, 61)

The following guideline factors are <u>disputed</u>:

Loss over $9.5 million:      +20  (PSR ¶ 54(b))

Means of ID to get ID:       +2  (PSR ¶ 54(e))

Leader/Organizer:            +4  (Govt's objections to the PSR)

Vulnerable victim            +2  (PSR ¶ 56)

No Acceptance of responsibility    (Govt's sentencing opposition)

<u>Government's total:        44</u>

As to loss, the parties agree that $10,000 of the American Express loss (relating to Tzvi Grossman), $100,000 of the RS Lending loss, and all $3,321,619 of the Genesis Capital loss should be excluded from the $10,081,740.89 in actual loss described in the PSR.  (PSR ¶ 148).  Reducing loss just for these undisputed amounts would result in actual losses of $6,650,121.89.

The government, however, contends that these losses should also be increased by $3 million for the Hoffmans, $254,899 for Dr.

16

Coppelson, $108,000 for the bank losses in Matthew Behar's name, $86,492 for Diana Lazzarini, and $80,800 for the VIP tickets to the music festival.   Adding these to the loss of $6,650,121.89 results in total actual losses of $10,180,312.89, or just a small amount more than set forth in the PSR, but still triggering the same +20-level enhancement.

## II.   THE 3553(A) FACTORS

In its sentencing position, the government pointed out that defendant had a long history of abusing drugs, going into rehabilitation, and then abusing drugs more.   It compared his claimed drug use to his admitted offenses, and showed that he continued to commit crimes even when by his own account he was drug-free, and that during his admitted heaviest periods of cocaine use he was *not* committing offenses.   Further, defendant used his time in rehabilitation to victimize the patients he met there. (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, pages 3-7.)   These facts all suggest, of course, that defendant's plea for drug treatment in lieu of a guideline sentence is misplaced.

How does defendant deal with these discouraging facts?   He simply ignores them, and blithely asserts "[t]his time would be different," and what he really needs is drug treatment.  (Deft's Brief 34.)   According to defendant, this is because he "has grown over the last year."  (Id.)   Regrettably, the evidence is to the contrary.   In jail he sought out more drugs (CR 18-11-AB, dkt. 53.), and attempted to arrange for a victim-witness to "recant" his testimony against defendant.  (CR 18-11-AB dkt. 76, CR 19-271-AB dkt. 25, pages 7-8, and 27-28.)   Even now defendant refuses to accept responsibility for his offense, falsely denying his

leadership role and that he defrauded some of his victims, as discussed previously.

Indeed, far from showing sympathy for his victims, defendant seems wedded to the view that *he* is the victim, despite his privileged circumstances, his loving family that he has repeatedly wronged, and the innumerable opportunities to turn his life around that he squandered so that he could stay in a $60,0000 a week mansion, and flaunt his stolen wealth.  Defendant seems to be believe that he is entitled to a lower sentence because he had an apartment near the World Trade Center on 9/11—-even though defendant himself was nowhere in the area.  Defendant includes macabre details, a "disembodied arm hung from the window sill" (deft's brief 26), for which there is no support in the record.

Defendant's argument that damage to his apartment "exacerbated his other yet untouched traumas" is as mystifying as it is disrespectful to the thousands of persons who perished on 9/11, and the tens of thousands of persons who lost loved ones, friends, and colleagues.  Following that tragedy, there was, in fact, a natural outpouring of sorrow, empathy, love, and patriotism.  Strangers hugged on the streets, and neighbors and co-workers took care of each other and their families.  Many Americans were inspired to enlist in the military to protect their country, and applications to become first-responders increased.  Defendant, however, responded differently.  During his college years, which encompassed 9/11, "he used [cocaine] three to four times a week" for "recreation[]" and to "have fun."  (PSR ¶ 107.)  While many persons who were not directly affected by 9/11, like defendant, were nonetheless upset or even traumatized by it, it is hard to see 9/11 having an effect on

defendant that is worth the Court's consideration at sentencing since it did not even delay defendant's graduation from NYU (PSR ¶ 117) or, it appears, diminish his partying there.

Dated: October 18, 2019            Respectfully submitted,

                                   NICOLA T. HANNA
                                   United States Attorney

                                   BRANDON D. FOX
                                   Assistant United States Attorney
                                   Chief, Criminal Division

                                   *Andrew Brown*
                                   _____
                                   ANDREW BROWN
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

## Declaration of Sherine Ebadi

I, SHERINE D. EBADI, do hereby declare and affirm:

I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2009.

**A.   VICTIM LAZZARINI INITIALLY MISUNDERSTOOD THE EXTENT OF DEFENDANT'S FRAUD**

Victim Diana Lazzarini told me that she had received proof of a partial payment by wire from defendant Jeffrey Yohai ("defendant" or "Yohai").   I explained to her that defendant had a history of fabricating evidence of wire transfers to lull his victims into believing that they had been paid.   I asked her to check her bank records to see if, in fact, such a wire had been credited to her account.   After doing so, she informed me that no such wire had been credited to her account, so that she had actually been defrauded of much more money than she had at first realized.

**B.   DR. COPPELSON'S LAWSUIT MENTIONED BY THE DEFENSE COVERS ONLY A SINGLE RENTER, NOT ALL OF DEFENDANT'S FRAUD**

Dr. Coppelson's civil action mentioned by defendant lists the loss at only about $109,000 because is only for one renter, Karl Anthony Towns.   That civil action is against Yohai and Manuela Villa, the real estate agent for Yohai and Towns.   Villa was not involved with any of the other renters who Yohai rented the Marcheeta property to without paying Coppelson, so those additional losses should not be listed in that lawsuit.

**C.   THE COACHELLA MUSIC FESTIVAL LOSS WAS $80,800**

According to the records I reviewed, the total actual loss for defendant's selling VIP tickets he did not possess was $80,800.

**D.   DEFENDANT USED MULTIPLE MEANS OF IDENTIFICATION WITHOUT AUTHORIZATION TO OBTAIN ADDITIONAL MEANS OF IDENTIFICATION**

Defendant repeatedly used another person's identity to obtain a loan, credit card, Paypal account, or other "means of identification."  In addition to getting and using the American Express card in Walter Kim's, defendant also leased vehicles in his wife's name without her consent.  I listened to a jail call from December 17, 2018, in which defendant asserted to his wife Jessica Manafort that the identity theft charges related to her in the complaint are "made up."  She responded, "I didn't know if they were talking about when you signed my name on all those [Range Rover] leases without me knowing."  Similarly, defendant used the name of his cousin Matthew Behar without authorization to obtain Airbnb and Paypal accounts.  Mr. Behar explained to me that defendant had contacted him from jail and asked him to log into an email account for defendant.  When he did, he saw multiple Paypal notifcations regarding bounced payments from a Paypal account in Matthew Behar's own name.  Mr. Behar explained to me that before this he had not known that defendant had been using his identity with Airbnb and Paypal to conduct business.  Mr. Behar told me that he assumed defendant was doing this because defendant was "banned from everything."

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 18, 2019

/s *Sherine Ebadi*

Sherine Ebadi